**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| **MOSKOWITZ FAMILY LLC** | : | |
| | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| v. | : | **No. 20-3271** |
| | : | |
| **GLOBUS MEDICAL, INC.** | : | |
| | : | |
| *Defendants*. | : | |

---

<u>**MEMORANDUM OPINION**</u>

Goldberg, J.                                                                  **August 24, 2023**

Plaintiff Moskowitz Family LLC ("Moskowitz") holds several patents pertaining to spinal implants designed to reduce adverse outcomes in spinal fusion patients. Moskowitz's inventions include minimal impaction, steerable, and custom-fit intervertebral implants that minimize musculoskeletal disruption and nerve root retraction during and after the procedure. Defendant Globus Medical, Inc. ("Globus") is another spinal fusion company that sells intervertebral spinal implants.

On November 20, 2019, Moskowitz sued Globus alleging both direct and indirect infringement of these various patents. On December 22, 2022, I granted summary judgment in favor of Globus on Moskowitz's claims of direct infringement of the '913 patent and the '022 patent and scheduled the remainder of the case for trial on December 4, 2023.

Currently at issue is Globus's Motion to Exclude the Testimony of Moskowitz's Damages Expert Paul K. Meyer pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Globus posits that Mr. Meyer's entire royalty opinion and the $88 million damages calculation he plans to present to the jury are premised on a prior settlement agreement entered between Globus and direct competitor DePuy Synthes Products, Inc. According to Globus, this agreement is exactly the sort of unrelated agreement resulting from an unrelated lawsuit that the Federal Circuit has repeatedly warned

damages experts against relying upon.  Moskowitz counters that Mr. Meyer relied on the most relevant licenses in the record and applied sound, well-accepted methodologies in reaching his opinions.  For the following reasons, I will deny the Motion.

## I.      FACTUAL BACKGROUND

### A.      <u>General Background on the Patents-in-Suit</u>

The human spine is composed of vertically arranged bones called vertebrae, which are separated by cartilaginous intervertebral discs.  The vertebrae are divided into three portions: (1) the uppermost seven are called the cervical spine; (2) the middle twelve are called the thoracic spine; and (3) the bottom five are called the lumbar spine.  Two pedicle bones dorsally extend from each vertebra and form an arch that protects the spinal cord.

In some individuals, the cartilaginous disc between vertebrae may wear, causing pain and pressure on the spinal cord.  For such individuals, spinal fusion surgery may offer relief.  This procedure permanently connects two or more spinal vertebrae to improve spinal stability, correct deformations, and reduce pain.  This procedure can also result in some adverse patient outcomes such as high-impaction, neural or vascular injury, esophageal injuries, excessive blood loss, prolonged surgical duration, prolonged recovery, and incomplete return to work results.  These adverse events may be the result of static and non-expandable implants, misplaced implants, and implant pull-out after surgery.

Moskowitz sought to invent minimally invasive spinal implants designed to reduce these adverse outcomes.  From January 15, 2013 through November 19, 2019, the United States Patent and Trademark Office ("PTO") issued to Moskowitz the eight patents at issue.  These patents are directed to intervertebral spine implant screws, staples, and expandable implant systems.  U.S. Patent Nos. 8,353,913 (the "'913 patent"), 110,307,268 ("'268 patent"), and 10,478,319 (the "'319 patent") are for tools used to manipulate and insert spacers into a disc space between two vertebral bodies to facilitate bone and screw fusion.  U.S. Patent No. 9,889,022 (the "'022 patent") is for an intervertebral screw guide and fixation apparatus for insertion into a disc space between two vertebrae to encourage bone

and screw fusion.  U.S. Patent No. 10,028,740 (the "'740 patent") claims a "curvilinear nail screw," a holding structure implanted into a vertebra and around the pedicle bones to avoid penetrating them.  U.S. Patent No. 10,251,643 (the "'643 patent") relates to an intervertebral mechanism that expands between vertebral bodies and engages vertebral endplates to keep the mechanism in place.  U.S. Patent No. 10,076,367 (the "'367 patent") is for a bidirectional system inserted between vertebrae to facilitate their linking and fusion.  Finally, U.S. Patent No. 10,376,386 (the "'386 patent") claims a spinal staple with a curved base and ridged spikes that hinder the staple's removal.

### B.     Background of the Relevant License Agreements Discussed by Mr. Meyer

Through discovery, Moskowitz served requests seeking all of Globus's patent license and/or settlement agreements related to spinal implant devices.  (Pl.'s Ex. A at No. 19.)  Moskowitz intended to provide these documents to its damages expert, Paul Meyer, so that he could determine what a reasonable royalty rate would be for Globus's licensing of Moskowitz's technology and, in turn, render a damages opinion.  Globus eventually produced five Globus license agreements related to spinal implant devices, one of which the parties agreed was not relevant to the computation of damages here. The remaining four agreements were reviewed by Mr. Meyer to determine whether they were probative of what would constitute a hypothetical license negotiation involving the technology at issue.  Although Mr. Meyer relied primarily on only one of the four, a brief discussion of all four provides necessary context for the parties' dispute.

The first agreement was between Bonutti Skeletal Innovations LLC ("Bonutti") and Globus (the "Bonutti/Globus License Agreement"), wherein Bonutti granted Globus a non-exclusive license to fourteen U.S. patents and two U.S. patent applications.  (Def.'s Ex. 10, Rep. of William Rosenberg ("Rosenberg Rep.") ¶¶ 264–69.)  The Bonutti/Globus License Agreement is a settlement and patent license agreement pertaining to allegations of infringement of six Bonutti patents concerning technology principally related to changing the spatial relationship between bones.  (Id. ¶ 264.)

3

Moskowitz's technology expert, William Rosenberg, opined that the Bonutti/Globus License Agreement does not relate to technology involving spinal implants, but rather to modifying the spatial relationship between bones in various locations throughout the body.  As those patents do not describe implants suitable for spinal fusion, Dr. Rosenberg concluded that they are not comparable to the patents-in-suit, an opinion with which Mr. Meyer agreed.  (Id. ¶¶ 264–69; Def.'s Ex. 1, Rep. of Paul Meyer ("Meyer Rep.") ¶¶ 158–67.)   Consistently, Globus's own damages expert opined that the Bonutti Agreement was not economically comparable.  (Pl.'s Ex. B, Dep. of Michael Lasinski ("Lasinski Dep.") 168:3-11.)

The second agreement reviewed by Mr. Meyer involved an Asset Purchase and Royalty Agreement between the University of Toledo and Globus (the "Toledo/Globus Agreement").  Under this agreement, the University of Toledo assigned two U.S. patent applications to be used for research and educational purposes. Mr. Meyer opined that this agreement was not comparable because it did not relate to any issued patents, was an acquisition rather than a license, and was irrelevant to any material Globus products.  (Meyer Rep. ¶¶ 168–176.)

The third agreement was a Patent Purchase Agreement entered into between Dr. Paul C. McAfee and Globus (the "McAfee Agreement"), wherein Dr. McAfee assigned a single patent application to Globus.  Mr. Meyer opined that this agreement was also not comparable because (a) Dr. McAfee was a member of Globus's Board of Directors, and consequently, the agreement was not necessarily an arms-length transaction, and (b) it pertained to patent applications unrelated to any Globus product.  (Id. ¶¶ 177–84.)

The final agreement is the one primarily in dispute here, the "Synthes/Globus License." Specifically, Globus and DePuy Synthes Products, Inc. ("Synthes") were involved in patent infringement litigation during which a jury heard testimony and rendered a verdict finding that Globus's INDEPENDENCE, COLATION, and InterContinental products (the products accused of infringement here) literally infringed all three of Synthes's ICI patents-in-suit.  On January 13, 2016, as a final

4

resolution of that litigation and USPTO proceedings, Globus and DePuy Synthes Products, Inc. entered the Synthes/Globus License.  The first part of the agreement is a license Synthes granted to Globus to allow future Globus ICI (Independence and Coalition) Products—which are among the products accused here—to practice Synthes ICI (Independence, Coalition, and InterContinental) Patents, in exchange for a royalty rate paid to Synthes of 10% of the Net Sales of those products.  The second part of the agreement involved a lump sum payment from Globus, a cross-license of patents, releases, and other grants of rights and licenses between the parties.  The Synthes/Globus license was executed two years before the hypothetical negotiation here, and Mr. Meyer deemed it comparable.  (Meyer Rep. ¶ 157.)

Globus disputes Mr. Meyer's reliance on the Synthes/Globus License as a reasonable comparator to determine damages and contends that his opinion should be excluded.  Globus also asserts that the Toledo/Globus Agreement and the McAfee Agreement are more reliable approximations of the hypothetical negotiations and should be the basis for a reasonable royalty rate.

## II.     STANDARD OF REVIEW

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)  The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  The testimony is based on sufficient facts or data;
> (c)  The testimony is the product of reliable principles and methods; and
> (d)  The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 places district courts in the role of "gatekeeper," requiring courts to "'ensure that any and all [expert] testimony . . . is not only relevant, but reliable.'"  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (quoting Daubert, 509 U.S. at 589).  The party offering an expert must demonstrate, by a preponderance of the evidence, that the expert's qualifications and opinions comply with Federal Rule of Evidence 702.  See Daubert, 509 U.S. at 592–93 (citation omitted).  Rule

702 has "a liberal policy of admissibility," <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 243 (3d Cir. 2008) (quotation omitted), and "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702, Advisory Comm Notes (2000).  As emphasized by the United States Supreme Court, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  509 U.S. at 595.

The <u>Daubert</u> inquiry "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."  <u>Schneider ex re. Estate of Schneider v. Fried</u>, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted).  Under the "qualification" standard for an expert, a witness must have "specialized knowledge" regarding the area of testimony, which, at a minimum, means the expert "must possess skill or knowledge greater than the average layman."  <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir. 1998). Construing this standard, the United States Court of Appeals for the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications."  <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994).  In other words, "an expert's qualifications should be assessed 'liberally,' recognizing that 'a broad range of knowledge, skills, and training qualify an expert as such.'"  <u>Thomas v. CMI Terex Corp.</u>, No. 07-cv-3597, 2009 WL 3068242, at *5 (D.N.J. Sept. 21, 2009) (quoting <u>Paoli</u>, 35 F.3d at 741).

The reliability restriction requires that the testimony be based upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" and that the expert have "'good grounds' for his or her belief."  <u>Calhoun v. Yamaha Motor Corp., U.S.A.</u>, 350 F.3d 316, 321 (3d Cir. 2003) (quotations omitted).  In that respect, reliability mandates an examination into the expert's conclusions in order to determine "whether [the conclusions] could reliably flow from the facts known to the expert and [the] methodology used."  <u>In re Diet Drugs Prod. Liab. Litig.</u>, 706 F.3d 217, 225 n.7 (3d Cir. 2013) (quoting <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 146 (3d Cir. 2000) (internal quotation marks omitted)).

Importantly, the rule does not require the party proffering the expert to demonstrate the "correctness" of the expert's opinion. <u>Paoli</u>, 35 F.3d at 744 (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness"). Rather, the party need only demonstrate "by a preponderance of the evidence" that the expert's opinion bears adequate indicia of reliability. <u>Id.</u>  Therefore, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595.  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." <u>i4i Ltd. P'ship v. Microsoft Corp.</u>, 598 F.3d 831, 852 (Fed. Cir. 2010), <u>aff'd</u>, 564 U.S. 91 (2011).

Finally, the issue of fit "is one of relevance and expert evidence which does not relate to an issue in the case is not helpful." <u>In re TMI Litig.</u>, 193 F.3d 613, 670 (3d Cir. 1999).  The standard for fitness is "not that high" but is "higher than bare relevance." <u>Paoli</u>, 35 F.3d at 745.  To determine whether an expert's testimony "fits" the proceedings, this Court asks whether it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); <u>see also</u> <u>UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres</u>, 949 F.3d 825, 835 (3d Cir. 2020).

## III.   DISCUSSION

Damages in a patent infringement case shall be "no less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  A reasonable royalty is defined as the amount that a willing licensor and licensee would bargain for at an arm's length hypothetical negotiation occurring on the date the infringement began. <u>Unisplay, S.A. v. Am. Elec. Sign Co., Inc.</u>, 69 F.3d 512, 517 (Fed. Cir. 1995) (citing <u>Hanson v. Alpine Valley Ski Area, Inc.</u>, 718 F.2d 1075, 1078 (Fed. Cir. 1983)).  The determination of damages based on a reasonable royalty is an issue of fact. <u>Id.</u>

One common way to determine a reasonable royalty is through the application of the so-called <u>Georgia-Pacific</u> factors. <u>See</u> <u>Uniloc USA, Inc. v. Microsoft Corp.</u>, 632 F.3d 1292, 1317 (Fed. Cir. 2011);

Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC, 879 F.3d 1332, 1348–49 (Fed. Cir. 2018).  In Georgia–Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir. 1971), the District Court for the Southern District of New York enumerated fifteen factors as a "comprehensive list of evidentiary facts relevant . . . to the determination of the amount of a reasonable royalty for a patent license." Id. at 1120.  The Georgia-Pacific factors include: (1) the royalties received by the patentee for the licensing of the patent, (2) the rates paid by the licensee for the use of other comparable patents, (3) the nature and scope of the license, (4) the licensor's established policy to not license others or condition the licensed use of the invention, (5) the commercial relationship between the licensor and licensee as competitors, (6) the effect of selling the patented invention in promoting sales of the parties' other patented or non-patented products, (7) the duration of the patent and term of the license, (8) the established profitability of the patented product, (9) the utility and advantages of the patented property over previous technology, (10) the nature of the patented invention, (11) the extent to which the infringer has made use of the invention, (12) the portion of the profit or selling price that is customary in the particular business to allow for the invention's use, (13) the portion of the realizable profit or selling price attributable to the patented invention as distinguished from non-patented elements, features added by the infringer, the manufacturing process, or business risks, (14) the opinion testimony of qualified experts, and (15) the amount that a licensor and licensee would have agreed upon at the time of the infringement in an arm's length negotiation.  Id. at 1120. "In performing a hypothetical negotiation analysis, it is important to recognize that some of the Georgia–Pacific factors may be of minimal or no relevance to a particular case and other factors may have to be molded by the Court to fit the facts of the case at hand." Procter & Gamble Co. v. Paragon Trade Brands, Inc., 989 F. Supp. 547, 607 (D. Del. 1997).

Here, Moskowitz's expert, Paul Meyer, prepared a 163-page expert report assessing the Georgia-Pacific factors and concluding that Moskowitz is owed a 10% royalty rate due to Globus's alleged infringement.  Globus now challenges Mr. Meyer's analysis of two of those factors.  First, under

Georgia-Pacific factor two, Mr. Meyer's reasonable royalty analysis relied, in part, on the Synthes/Globus License.  Moskowitz contends that that License is an unrelated agreement arising from an unrelated suit, and as such, Mr. Meyer's reliance on that settlement for reasonable royalty rate renders his opinion unreliable.  Second, under Georgia-Pacific factor twelve, Globus contends that Mr. Meyer's backup reliance on another settlement agreement between DePuy Spine, Inc. and Alphatec is also not comparable or reliable and should be excluded.

### A.  The Synthes/Globus License

As noted above, under the second of the Georgia-Pacific factors, an expert can consider rates paid by the licensee—in this case, Globus—for the use of other comparable patents.  One approach to calculating a reasonable royalty imagines a "hypothetical negotiation" between a "willing licensor" and a "willing licensee" "to ascertain[] the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324–25 (Fed. Cir. 2009).  That approach—like any reconstruction of a hypothetical in which the infringer did not infringe but negotiated in advance for authority to practice the patents— does not require "mathematical exactness," but only a "reasonable approximation" under the circumstances.  Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 807 F.3d 1283, 1303–1304 (Fed. Cir. 2015).

"[L]icenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license in suit."  Lucent, 580 F.3d at 1325.  Actual licenses to the patents-in-suit are highly probative to the proper amount and form of a reasonable royalty.  LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012); Procter & Gamble Co. v. Paragon Trade Brands, Inc., 989 F. Supp. 547, 607 (D. Del. 1997).  In the absence of such licenses to the patents-in-suit, it is well-established that an expert can look at the rates paid by the licensee for the use of other patents comparable to the patents-in-suit.  Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1316–17 (Fed. Cir. 2011).  "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability

between different technologies or licenses does not suffice," <u>LaserDynamics</u>, 694 F.3d at 79, and the patentee bears the burden of proving that the licenses at issue are sufficiently comparable. <u>Lucent</u>, 580 F.3d at 1329. To show that a license is "sufficiently comparable," the expert must demonstrate "how similar or dissimilar the patented technology" covered by the prior licenses is to the patents-in-suit and "account for 'the technological and economic differences'" between the patented technology and the patents-in-suit. <u>Lucent</u>, 580 F.3d at 1331; <u>Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.</u>, 609 F.3d 1308 (Fed. Cir. 2010). "[C]ourts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies *other* than the patents-in-suit," and "must account for differences in the technologies and economic circumstances of the contracting parties." <u>VirnetX, Inc. v. Cisco Sys., Inc.</u>, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quotations omitted) (emphasis in original). Ultimately, "[t]he testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded. <u>IOENGINE, LLC v. PayPal Holdings, Inc.</u>, 607 F. Supp. 3d 464, 501 (D. Del. 2022).

The Federal Circuit has noted that prior licenses are almost never perfectly analogous to the infringement action. <u>Ericsson, Inc. v. D-Link Sys., Inc.</u>, 773 F.3d 1201, 1227 (Fed. Cir. 2014). As such, it has "never required identity of circumstances; on the contrary [it] ha[s] long acknowledged that 'any reasonable royalty analysis necessarily involves an element of approximation and uncertainty.'" <u>VirnetX</u>, 767 F3d at 1330. Ultimately, so long as the expert's comparability analysis exceeds "loose, vague allegations of comparability," <u>First Quality Tissue, LLC v. Irving Consumer Prods Ltd.</u>, No. 19-cv-428, 2022 WL 958089, at *17 (D. Del. Mar. 30, 2022), the degree of comparability of license agreements is usually a factual issue best addressed by cross examination and not be exclusion of an expert. <u>VirnetX, Inc.</u>, 767 F.3d at 1331. Stated differently, "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." <u>Ericsson</u>, 773 F.3d at 1227; <u>see also</u> <u>Bio-Rad Labs., Inc. v. 10X Genomics Inc.</u>, 967 F.3d 1353, 1373 (Fed. Cir. 2020) ("[T]he issue of comparability is often one of sufficiency of the evidence, not admissibility."); <u>ActiveVideo</u>

Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the . . . license agreements as well as any failure on the part of [plaintiff's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion.").

Here, Globus contends that the Synthes/Globus License is not comparable to the hypothetical license that would have resulted from negotiation between Moskowitz and Globus either on a technological level or on an economic level.  Globus urges that, given this lack of comparability, the jury should not be allowed to hear Mr. Meyer's expert opinion, which relies on the License to generate an $88 million damages model.

    1. Technological Comparability

Globus first argues that the Synthes-Globus Settlement is not technologically comparable as it involved mutual licenses to five different Synthes patents.  (Def.'s Exs. 5–9.)  Synthes's '210 and '057 Patents relate to a "flexible connection unit for use in a spinal fixation device," 'Synthes's '207 and '616 Patent relates to a design for a "three-dimension" intervertebral implant, and Synthes's '06 Patent relates to a "three-dimension" implant with a different depiction.  Globus contends that none of these inventions is "remotely similar" to Moskowitz's "horizontal-transvertebral nail screw" ("HTCN") invention.[1] Globus thus concludes that Moskowitz and its experts have not carried their initial burden of proving that the licenses at issue are technologically comparable.

Mr. Meyer's technological comparability assessment relied exclusively upon the report of Moskowitz's technical expert, Dr. Rosenberg, who opined that Synthes's "Intervertebral Implant Patents are technically comparable to the asserted patents because they relate to devices for implantation into or fixation of the spine" and that the "technical contribution of the Asserted Patents represents greater

---

[1] Specifically, Moskowitz's '740 Patent discloses the HTCN invention, Moskowitz's '643 Patent discloses a self-drilling screw apparatus, Moskowitz's '268 Patent discloses the expandable implant invention, and Moskowitz's '319 Patent discloses an expandable implant with some claims covering tools.

advancements than those of the patents subject to the Synthes/Globus license." (Rosenberg Rep. ¶ 258.) It is well established that experts "may use a mix of objective data and subjective analysis from another expert to . . . create an admissible report," and the testifying expert's knowledge regarding the underlying facts "go[es] to the weight accorded to [that expert's] report and testimony, rather than its admissibility." I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants, No. 03-cv-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008) (quoting In re Wagner, No. 06-cv-1026, 2007 WL 966010, at *4 (E.D. Pa. Mar. 29, 2007)). Indeed, "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." Dura Auto. Sys. of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 613 (7th Cir. 2002) (Posner, J.); see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 286 F.R.D. 266, 271 (W.D. Pa. 2012) ("[I]t is well-settled that one expert may rely upon another expert's opinion in formulating his own.").

Notably, Globus did not file a Daubert challenge to Dr. Rosenberg's expert report. Nor has Globus pointed to any expert testimony that undermines Dr. Rosenberg's opinion. Given Dr. Rosenberg's unchallenged opinion, Mr. Meyer's reliance on that opinion to conclude that the Synthes/Globus License is a technologically good comparator constitutes an appropriate and reliable methodology for determining reasonable royalty.

Nonetheless, in support of its Motion to Exclude Mr. Meyer's opinion and his reliance on Dr. Rosenberg, Globus presses several arguments attacking Dr. Rosenberg's opinion. First, it contends that beyond the fact that Synthes's patents—like the patents-in-suit—cover devices related to implantation into or fixation of the spine, there are no other commonalities with Moskowitz's patents. Globus argues that simply because the inventions come from the same general field or area of technology does not make them technologically comparable. Referencing figure drawings of Synthes's and Moskowitz's patents, Globus contends that "[i]t is obvious from the above patent images that [Moskowitz's] inventions are meaningfully different from Synthes' inventions." (Def.'s Mot. to Exclude 11.)

Aside from providing these images, Globus fails to provide any explanation of what these differences are, let alone how they are so "meaningful" as to preclude the Synthes patents from being reasonable comparators. Indeed, contrary to Globus's argument, Dr. Rosenberg observed that the inventions at issue, both from Moskowitz and Synthes, are not just in the same field of spinal implantation but are devices for implantation into or fixation of the spine that are affixed with transvertebral screws. Both Moskowitz and Synthes accused the identical Globus products of infringing on those patents, suggesting at least some overlap in the technology. Dr. Rosenberg explained that, based on specifications of Synthes's Intervertebral Implant Patents, the "patented devices can include four basic parts: (1) a body or spacer that contains internal bores; (2) a plate that corresponds to the body or spacer and includes bores; (3) various fixation structures such as screws; and (4) some supplemental fixation such as a securing plate." (Rosenberg Rep. ¶ 261.)

Dr. Rosenberg further discussed each of the three Synthes patents separately and identified their similarities and differences with Moskowitz's patents. (Id. ¶ 262.) He commented that although the Synthes Intervertebral Implant Patents are technically comparable, these patents represent a "smaller technical contribution [than those in three of the asserted patents] because they relate to a narrow improvement directed to a blocking plate designed to prevent implantation screws from backing out of the implants, but that blocking plate does not provide any protection against the implants themselves from becoming dislodged from the patient." (Id. ¶ 263.) Dr. Rosenberg then found that asserted Patent '643 is slightly less technically significant than the Synthes patents. (Id. ¶ 271.) Thus, it was not unreasonable for Mr. Meyer to rely upon Dr. Rosenberg's comparator opinion to conclude that while there are distinctions in the technology, the Synthes and Moskowitz patents are more than "loosely comparable."

Globus also claims that Mr. Meyer's reliance on Dr. Rosenberg's technological comparability opinion was unreasonable because Dr. Rosenberg did not distinguish among Moskowitz's different inventions but rather effectively lumped all the various Moskowitz technologies together for purposes

of comparing them to three of the five licensed Synthes patents, ignoring all of the distinctions among Moskowitz's different patents and disregarding the other two licensed Synthes patents. As Dr. Rosenberg explained, however, his analysis focused on only three of the Synthes patents because the 10% royalty in the Synthes/Globus license specifically applied to Globus products practicing those three patents, making a technical analysis of the other two Synthes patents irrelevant to that royalty rate. (Rosenberg Rep. ¶¶ 143–45.) Moreover, and contrary to Globus's arguments, Dr. Rosenberg separately considered Moskowitz's asserted patents and found that all but the '643 Patent constitute a substantially greater technical improvement than the Synthes Patents, thus accounting for distinctions in the technology. (Id. ¶ 271–72.)

Finally, Globus relies on Adasa Inc. v. Avery Dennison Corp., 55 F.4th 900 (Fed. Cir. 2022), cert. denied, 2023 WL 3696138 (2023), and asserts that merely identifying a subject area of technologies, without more, is insufficient to serve as a meaningful comparison point to the specific technology at issue. In Adasa, the district court excluded expert testimony regarding allegedly comparable licenses where the licenses at issue "involved hundreds or thousands of patents that spanned a broad range of technologies" and where the expert, in "a single brief paragraph," observed that the licensed portfolios "include patents that cover RFID transponders," which was the technology at issue in the patents-in-suit. Id. at 915. The Federal Circuit affirmed, noting that "RFID technology" was too broad and vague a category to serve as a meaningful comparison point to the specific technology at issue there, and merely observing that "*some* patents in a portfolio cover RFID technology . . . says nothing about the comparability of the thousands of remaining patents in the portfolio." Id. (emphasis in original).

Here, Dr. Rosenberg's technological comparison analysis—upon which Mr. Meyer premises his reasonable royalty opinion—is different than in Adasa and does much more than provide a "loose or vague comparability" between the patents.[2] As noted above, Dr. Rosenberg first opined that Synthes's

---

[2]    Globus also cites to Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301 (Fed. Cir. 2009). That case, however, did not arise in the context of a Daubert motion but rather on appeal of a jury determination. The Federal Circuit concluded that "a lump-sum damages award cannot stand solely on

patents are comparable to the asserted patents because they relate to devices for implantation into or fixation of the spine.  (Rosenberg Rep. ¶ 258.)  Indeed, Synthes alleged infringement by the identical Globus technology accused here.  Dr. Rosenberg then went beyond a "single brief paragraph" identifying the common area of technology and explains that the Synthes patents contain certain basic parts that correspond to the patents-in-suit, but that the patents-in-suit reflect a greater technological advancement due to their minimally invasive surgical techniques resulting in significantly improved patient outcomes. (Id. ¶¶ 260–63, 271.)

While Globus may ultimately be able to undercut Dr. Rosenberg's conclusions regarding identified technological distinctions, those discrepancies do not constitute a basis for wholesale exclusion of Dr. Meyer's opinion.  As set forth previously, "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 852 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011); see also Ravo v. Covidien LP, 55 F. Supp. 3d 766, 775 (W.D. Pa. 2014) ("Once the expert shows some 'discernible link between the comparable license and the claimed technology,' distinctions and oversights are matters for cross-examination.").

### 2.  Economic Comparability

Globus also contends that the Synthes/Globus License was not negotiated under economically comparable circumstances to the hypothetical Moskowitz/Globus negotiations.  Absent such economic comparability, Globus asserts that Mr. Meyer's reasonable royalty opinion must be excluded.

The Federal Circuit has recognized that although licenses from "vastly different situations" may not bear the necessary economic comparability, less drastic differences become factual issues best

---

evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here."  Id. at 1329.  The licenses were from "vastly different situations" and the subject matter of certain agreements was not ascertainable from the evidence presented at trial. Id. at 1327–28.

addressed by cross examination and not by exclusion.  VirnetX, 767 F.3d at 1330.  For example, in Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1211 (Fed. Cir. 2010), the Court noted that differences existed between the single license relied upon and the hypothetical negotiation, including that: the plaintiff did not compete with the licensee as it did with the defendant; the plaintiff received significant intangible value from the licensee's endorsements of the plaintiff; and the license involved a lump sum rather than a running royalty.  Id. at 1212.  The Federal Circuit determined that the differences, brought out on cross-examination, "permitted the jury to properly discount the license."  Id.

Similarly, in ActiveVideo Networks Inc. v. Verizon Communications, Inc., 694 F.3d 1312 (Fed. Cir. 2012), the damages expert relied on two license agreements, one of which post-dated the hypothetical negotiations by two years, did not involve the patents-in-suit, and did not cover the technologies in the case, and the other of which covered both patents and software services.  Id. at 1333. The court concluded that "the degree of comparability" of the license agreements was a "factual issue[] best addressed by cross examination and not by exclusion."  Id.

Finally, in VirnetX, supra, four of the relied-upon licenses related to the actual patents-in-suit, while the others were drawn to related technology.  Id. at 1330.  Two of the licenses predated the date of the hypothetical negotiations, while three post-dated the hypothetical negotiations and were at a time when the plaintiff was in a better bargaining position.  Id.  One license covered sixty-eight patents as opposed to the four sought in the hypothetical negotiation.  Id.  The Court remarked that those differences were all presented to the jury, allowing it to "fully evaluate the relevance of the licenses."  Id.

Here, over the course of twenty-one paragraphs, Mr. Meyer provided an analysis of economic comparability, addressing factors including the similarity of the licensee and licensed products, geographic coverage, exclusivity, date of agreement, cross-license provisions, additional licensed intellectual property, bargaining-negotiating positions of the parties, technical value of the patents, royalty form and sales volumes, assumption of validity and infringement in the hypothetical negotiation, and license agreements including settlements of litigation.  (Meyer Rep. ¶¶ 136–56.)

Globus identifies several differences between the Synthes license and the hypothetical negotiation that it believes renders the Synthes/Globus License not economically comparable. Specifically, Globus contends that: (1) Synthes and Globus are direct, head-to-head competitors, while it is undisputed that Moskowitz never competed with Globus in any way; (2) Mr. Meyer set aside two agreements that provided indicators of the royalty rates Globus pays to acquire patent rights from licensors that are not competitors, ranging from 0.4% to 0.8% of net sales; (3) Globus never actually paid, or even intended to pay, Synthes the 10% royalty rate; (4) the Synthes agreement included releases and grants that are different from those that would be present in a hypothetical negotiation; and (5) the Synthes agreement arose out of a settlement of litigation and not out of a voluntary agreement between a willing licensor and licensee, rendering its use improper.   Considered either individually or collectively, I do not find these distinctions to warrant exclusion of Dr. Meyer's testimony.

As to the bargaining-negotiating positions of the parties, Mr. Meyer addressed this issue in his report, noting that while Synthes and Globus were competitors, each selling spinal implants, Moskowitz is not a competitor of Globus because it does not sell spinal implants.  (Meyer Rep. ¶ 148.)  Mr. Meyer went on to note that, "[d]epending on circumstances, potential licensors may negotiate higher royalty rates from competitors to compensate the licensor for additional financial impacts of licensing. Therefore, there would be downward pressure to the royalty rate in the Synthes/Globus License Agreement as [Moskowitz] and [Globus] are not competitors."  (Id.)  Although Mr. Meyer did nothing to assess how much lower than 10% the reasonable royalty rate should be to account for the lack of a competitive relationship, I note that such mathematical precision is not required, and Mr. Meyer only needed to provide some explanation why and to what extent this lack of a competitive relationship impacted the royalty calculation.  See Bio-Rad Labs., Inc. v. 10X Genomics, Inc., No. 15-cv-152, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018) (citing Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 31 (Fed. Cir. 2012)).  Globus can then probe this discrepancy on cross-examination.

Globus next contends that two other agreements provided more reliable indicators of the royalty rates Globus pays to acquire patent rights from licensors that are not competitors, ranging from 0.4% to 0.8% of net sales.  First, relying on the report of its expert Michael Lasinski, Globus points to the McAfee Agreement in which Globus and Dr. Paul C. McAfee entered into a patent purchase agreement involving an expandable spinal fusion implant and flexible driver technologies, which were subject of pending patent applications.  (Def.'s Ex. 11, Rep. of Michael Lasinksi ("Lasinski Rep.")  ¶ 48.)  In exchange for the assignment, Globus agreed to pay Dr. McAfee 0.5% of net sales of any potential products using the assigned patent assets.  (Id. ¶ 49.)  Second, Globus refers to the Toledo/Globus Agreement in which the University of Toledo granted Globus rights to practice spinal fusion implant-related technology covered by the patent assets in exchange for a closing fee of $40,000 and 1% of net sales of any potential products using the patents.  (Id. ¶¶ 53–55.)  Moskowitz contends that the presence of these more reliable comparator licenses undermines Mr. Meyer's reliance on the Synthes/Globus License as the most applicable comparator.

Mr. Meyer, however, considered and distinguished these two agreements.   As to the Toledo/Globus Agreement, Mr. Meyer remarked that it was not a proper comparator for a reasonable royalty because: (a) it was not clear at the time of the agreement whether the acquired patent applications would become issued patents, whereas the hypothetical negotiations involved issued and assumed-valid patents; (b) it was not clear at the time of the agreement if the acquired technology would be commercialized or even what products from Globus (if any) would practice the licensed technology, whereas the hypothetical negotiations involved technology that had been commercialized and widely used; and (c) the extent of use of the acquired technology (if any) is significantly less than the technology claimed in the asserted patents.[3]  (Meyer Rep. ¶¶ 168–176.)

_____

[3]     In its Reply Brief, which was untimely filed and raised arguments that could have been raised in the initial brief, Moskowitz argues that the Toledo/Globus Agreement contained provisions that would not require Globus to make royalty payments to the licensors until the assigned patents issued, obviating concern about the patents not having been issued at the time of the negotiations.  This argument fails to address what,

As to the McAfee Agreement, Mr. Meyer also noted that it was not a proper comparator because: (a) Dr. McAfee was on the Board of Directors at Globus and has served as an expert witness on behalf of Globus, meaning that the agreement had the appearance of not being an arms-length transaction; (b) it was not clear at the time of the agreement whether the acquired McAfee patent applications would become issued patents; (c) it was not clear at the time of the agreement whether the acquired technology could be commercialized and incorporated into any product from Globus, whereas in the hypothetical negotiations, the asserted patents were issued and assumed valid and there was no uncertainty about the ability to commercialize.  (Id. ¶¶ 177–84.)

To the extent Moskowitz's expert and Globus's expert offer differing, but plausible arguments, regarding the preferred comparator for reasonable royalty, such a matter is properly considered by a factfinder and does not render Mr. Meyer's report unreliable under a Daubert analysis.  See ActiveVideo, 694 F.3d at 1333 (holding that the "degree of comparability" of two different license agreements was "[a] factual issue[] best addressed by cross examination and not by exclusion.").

In its third argument, Globus contends that it never paid the 10% royalty rate set forth in the Synthes/Globus License.  It explains that the Synthes/Globus License specifically excluded redesigned products, and Synthes and Globus both knew the products were being redesigned.  Globus then contends that the fact that Globus redesigned the accused products and expected that it would never pay the 10% royalty rate on any product sales makes Mr. Meyer's 10% royalty rate based on the Synthes/Globus License "no more probative than a randomly generated number."  (Def.'s Mot. to Exclude 12.)

This argument is inapposite on several grounds.  Primarily, Moskowitz disputes the validity of this representation, and Globus has failed to produce any evidence to substantiate that Globus never paid

_____

if any, impact on the negotiating environment and bargaining power resulted from the absence of a legally-enforceable patent at the time of the agreement.

or expected to pay the 10% royalty rate.[4]  Moreover, I note that when confronted with this assertion at

his deposition, Mr. Meyer indicated that it would have no impact on his opinion:

> Because the parties at the time they reached the agreement with—they
> probably had five years of experience with each other across their product
> lines.
>
> It was obviously important to the parties to have these provisions.  If it
> wasn't important, it wouldn't be in the agreement.  They would have said,
> Let's just pay this lump sum and move on.
>
> But Synthes and Globus spent considerable time negotiating those clauses.
> In fact, I think the one clause, I think it's 7.12, even says we had
> sophisticated parties involved in this agreement.
>
> So when you have businesspeople and negotiators and lawyers working out
> an agreement and you take the time carve out this 10 percent for this covered
> product definition, to me, that's highly relevant as a market metric.
>
> Going forward, if they didn't pay royalties, that doesn't impact my opinion.
> . . .
> And so my point is that the parties knew that there were these design-
> arounds.  But the question is, going forward, what would happen if the
> market didn't accept them?
>
> Well, Globus had the ability to go sell a product that in the past it had sold
> $110 million of, which is a lot of sales.  And that's what they worked out.
> And each side agreed to that in an arm's length deal that I get to examine,
> and it's been produced by Globus, and that they willingly entered into.
>
> So anyway, that's the basis of the market side of it.  So whether they actually
> paid on the agreement or not doesn't impact my opinion.

(Dep. of Paul Meyer ("Meyer Dep.") 74:11—76:17.)  Globus points to no contrary evidence to rebut

this opinion.

Fourth, Globus contends, in one sentence, that the Synthes agreement includes releases and

grants of rights different from those that would be present in a hypothetical license.  Mr. Meyer

acknowledged these other releases and grants but noted that they were included in the lump-sum

---

[4]     Globus relies on the report of its expert, Michael Lasinski, who relied on hearsay conversations with
Globus's Vice President and Chief Patent Counsel, to state his understanding that the 10% royalty was only
going to be paid if Globus reintroduced the accused versions of its products on the market instead of using
the redesign and that Globus has never paid the 10% royalty rate.  (Lasinski Rep. ¶ 66.)  Globus has not
produced any testimony from that employee indicating that Globus never expected to pay the royalty rate.

payment of $7.9 million.  (Meyer Rep. ¶ 143.)  He remarked that the 10% royalty rate specifically applied to Globus's sales of Globus ICI Products as royalty consideration for a license to the Synthes ICI Case patents.  (Id. ¶ 144.)  Accordingly, Mr. Meyer adequately accounted for these releases and grants.

Globus's last argument regarding economic comparability posits that the Synthes agreement arose in the context of litigation, rendering the license not comparable to a hypothetical license with Moskowitz.  This point merits more robust discussion.

The Federal Circuit has recognized that "[t]he propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable" because such agreements "are tainted by the coercive environment of patent litigation [and may be] unsuitable to prove a reasonable royalty. . . [under a Georgia-Pacific analysis], the premise of which assumes a voluntary agreement will be reached between a willing licensor and willing licensee, with validity and infringement of the patent not being disputed."  LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 77 (Fed. Cir. 2012). Nonetheless, the Federal Circuit has also remarked that "there is no per se rule barring reference to settlements simply because they arise from litigation." AstraZeneca AB v. Apotex Corp., 782 F.3d 1324, 1336 (Fed. Cir. 2015).  Thus, "depending on the circumstances," a license agreement entered in settling an earlier patent suit may be admissible.  Prism Techs LLC v. Sprint Spectrum L.P., 849 F.3d 1360, 1368–69 (Fed. Cir. 2017); see also Elbit Sys. Land and C41 Ltd. v. Hughes Network Sys, LLC, 927 F.3d 1292, 1299 (Fed. Cir. 2019) ("[W]hether in using a settlement at trial or in drawing the appropriate lessons from the particular settlement for the case in which it is being used, relevant circumstances— such as similarities and differences in technologies and market conditions and the state of the earlier litigation when settled—must be carefully considered."); ResQNet.com, Inc. v. Lansa, 594 F.3d 860, 872 (Fed. Cir. 2010) ("[A] reasonable royalty may permissibly reflect '[t]he fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty.'").

To determine whether a litigation settlement agreement is admissible for purposes of proving reasonable royalty, the Federal Circuit has noted:

> What is needed for assessing the probativeness and prejudice components
> of the Rule 403 balance, then, is consideration of various aspects (of which
> we have mentioned some) of the particular litigation settlements offered for
> admission into evidence. That approach, reflected in our decisions, is also
> supported by the inherent connection between patent licenses and at least
> the potential for litigation. A patent gives nothing but the right to exclude,
> which in our system generally means a right to call on the courts. . . . We
> have frequently recognized that a (non-exclusive) license to practice a
> patent is in substance nothing but a covenant not to sue: what such a license
> is, at its core, is an elimination of the potential for litigation.

Prism Techs., 849 F.3d at 1370 (Fed. Cir. 2017). Thus, "as a logical matter, the mere filing of a

complaint—shifting from potential to actual litigation—does not automatically turn the prejudice side

of the Rule 403 balance into one that substantially outweighs the probativeness side. The particulars of

the case that was settled and the settlement, as well as of the case in which the settlement is offered as

evidence, matter to the Rule 403 balance." Id.

Notably, unlike licenses negotiated in the middle of infringement and validity litigation,

"licenses negotiated to settle a case after a court has established validity and infringement of the patent

are very probative of reasonable royalty. Such licenses duplicate the analytical process undertaken by

the court in setting reasonable royalty damages in the 'willing licensor-willing licensee' fictional

negotiation." John M. Skenyon et al., Patent Damages Law and Practice § 1:15, at 25 (2013 ed.) In

such a case, the parties' agreed upon settlement "constitute[s] persuasive evidence" that a royalty rate in

a similar range would be reasonable. AstraZeneca AB, 782 F.3d at 1337.

Here, Mr. Meyer noted that the Synthes/Globus License was negotiated when underlying

litigation was far advanced and issues impacting valuation had been well explored and tested. (Meyer

Rep. ¶ 155.) More specifically, the settlement was reached after a jury heard testimony and rendered a

verdict finding that Globus's INDEPENDENCE, COALTION, and InterContinental products (the

products accused of infringement here) literally infringed all three of Synthes's ICI patents-in-suit. (Id.)

The jury then adopted a 15% royalty rate to compensate Synthes for Globus's infringement, and the trial

judge issued a post-verdict order directing Globus to pay an 18% running royalty from July 1, 2013

through patent expiration on the same products.  (Id.)  Against this backdrop, and in lieu of further

appeals, the parties settled at the lower royalty rate of 10%.  Mr. Meyer explained that this settlement

was a proper comparator here "because the settlement occurred after many years of negotiations and

four litigations and significant analysis by Judge Stark."  (Meyer Dep. 44:14—17.)

In the face of this analysis, Globus offers only vague contrary arguments premised on the fact

that the Synthes/Globus License arose in the context of a litigation settlement.[5]  Globus contends that

while Mr. Meyer purported to account from some of the distinguishing facts identified in his report, he

merely paid "lip-service" to those distinctions since he reached the same royalty rate as that reached in

the Synthes settlement.[6]  As noted above, however, Mr. Meyer adequately remarked that the settlement

occurred after a finding of infringement and validity.  He further noted that the 10% royalty rate was

---

[5]      Citing Plexxikon Inc. v. Novartis Pharms. Corp., No. 17-cv-4405, 2021 WL 97544, at *6—7 (N.D.
Cal. 2021), Globus argues that "[i]t is highly unusual, and improper, for a patent holder to rely on a settlement
agreement involving different patents than those asserted in the case." (Def.'s Mot. to Exclude 13 (citing).
Plexxikon does not stand for the proposition Globus sets out.  In Plexxikon, the court noted that "settlement
licenses are treated much like other licenses, requiring the proponent to establish sufficient comparability
while accounting for any differences." Plexxikon, 2021 WL 97544, at *6.  The court rejected the defendant's
argument that the settlement license must be the most reliable license in the record to be admitted. Id.  While
the settlement license in that case was excluded, the court did so given not simply the litigation-focused
circumstances of the license negotiations, but also the differences of the licensed products and technology.
Id. at *7.  In addition, the court noted that the patents in the settlement license were potentially invalid and
there was no evidence that the defendant had actually infringed.  Id.

[6]      Globus contends that two other courts have previously rejected a "strikingly similar effort by a non-
practicing entity plaintiff suing Globus for alleged patent infringement to piggyback on the Synthes-Globus
Settlement and its 10% royalty rate."  (Def.'s Mot. 2.)  However, in the first case, Flexuspine v. Globus
Medical Inc., No. 15-cv-201, 2016 WL 9276023, at *4 (E.D. Tex. July 6, 2016), the court did not exclude
the Synthes/Globus License simply because it was in the context of litigation.  Rather, the court noted that
there was a better comparator license agreement as the plaintiff had executed a license for the exact patents-
in-suit, outside the litigation context.  By contrast here, there is no prior licensing of the patents-in-suit to
provide a comparator.  Moreover, in Flexuspine, the court remarked that the expert did not provide adequate
support for his technological comparability conclusion as he opined only that the Synthes patents are "in the
same field of use and relate to the same types of products as the patents-in-suit." Id. at *5.  Again, by contrast
here, Dr. Rosenberg's technological comparison opinion went far beyond broad field-of-use comparisons.

In the second case, Acantha LLC v. DePuy Orthopaedics Inc., No. 15-cv-1257, 2018 WL11414082
(E.D. Wis. Apr. 25, 2018), the court excluded reliance on the Synthes/Globus License because (1) that
settlement dealt with three patents as opposed to the single patent at issue in the case, (2) the settlement
agreement was reached more than ten years after the hypothetical negotiation date, and (3) there was a more
reliable license in the record to use as a comparator as it involved the patent-in-suit and was entered outside
of the litigation context.  By contrast here, both the Synthes settlement and the hypothetical negotiation
involve several patents, and there is no more reliable license involving the patents-in-suit. Id. at *4.

attributable to the ICI patents and products, which are the same products accused of infringement here, and that the rate was similar to what would have occurred in a hypothetical negotiation.

        3.   <u>Conclusion as to Mr. Meyer's Use of the Synthes/Globus License as a Comparator</u>

Undoubtedly, there are differences—both in technological aspects of the inventions at issue and in the economic circumstances of the negotiations—between the Synthes/Globus License and the hypothetical negotiations at issue. However, "[u]se of actual past licenses and negotiations to inform the hypothetical negotiation does not 'require[] identity of circumstances.'" <u>Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys, LLC</u>, 927 F.3d 1292, 1299 (Fed. Cir. 2019) (quoting <u>VirnetX, Inc.</u>, 767 F.3d at 1330)). Instead, the prior licenses or settlements need to be "sufficiently comparable" with any differences in circumstances "soundly accounted for." <u>Id.</u>

Mr. Meyer's expert report did not purport to opine that the Synthes/Globus License is identical to the hypothetical negotiations here. Rather, he acknowledged and accounted for the distinctions and imposes upwards and downwards pressures on the royalty number based on such distinctions. Ultimately, the fact that he settled on the same royalty rate reached in the Synthes Settlement does not suggest blind adoption of that rate. And at trial, Globus will be free to further test his opinion through cross-examination and to argue that a lower royalty rate is appropriate due to some of the identified factors. Nothing in Globus's Motion, however, indicates that Mr. Meyer's opinion as to reasonable royalty should be wholly excluded.

    **B.**  **<u>Mr. Meyer's Back-Up Opinion Based on the Depuy-Alphatec Agreement</u>**

In a separate challenge to Mr. Meyer's report, Globus challenges Mr. Meyer's "backup" consideration of a settlement agreement between DePuy Spine Inc., Biedermann Motech GmbH, and Alphatec Spine Inc. (the "Depuy-Alphatec Agreement") wherein the entities agreed to a 10% royalty rate. Globus argues that the Depuy-Alphatec Agreement is no more comparable than the Synthes/Globus License because neither Moskowitz nor Globus was a party to this agreement, it does not involve technology comparable to Moskowitz's, and the settlement is not economically comparable because

Depuy and Alphatec were competitors settling ongoing litigation.  Globus concludes that "[a]llowing the jury to hear about a far-afield settlement between non-parties would cause confusion."  (Def.'s Mot. to Exclude 15.)

Mr. Meyer's report addressed the DePuy-Alphatec Agreement under factor twelve of the Georgia-Pacific factors.  The twelfth Georgia-Pacific factor is broader, expressly considering royalty rates that "may be customary in the particular business or *in comparable businesses* to allow for the use of the invention of *analogous inventions*."  Intuitive Surgical, Inc. v. Auris Health, Inc., 549 F. Supp. 3d 362, 372 (D. Del. 2021) (quoting Georgia-Pacific, 318 F. Supp. at 1120 (emphasis in original)).  Factor twelve specifically allows for consideration of related technologies.  TC Tech. LLC v. Sprint Corp., No. 16-cv-153, 2019 WL 2515779, at *15 (D. Del. June 18, 2019).  Although comparability must be proven under factor twelve, it focuses on royalty rates for the use of similar inventions and does not necessarily require the same level of comparability as factor two.   Factor twelve is also broad enough to encompass information agreed upon in settlement litigation.  Id.; see also Volumetrics Med. Imaging, Inc. v. Toshiba Am. Med. Sys., Inc., No. 05-cv-955, 2011 WL 2470460, at *12–15 (M.D.N.C. June 20, 2011)

Here, Mr. Meyer established a demonstrable connection between the royalty in the DePuy-Alphatec Settlement and the present case.  He notes that the agreement provides a relevant valuation indicator for determining a royalty rate, although not as relevant as the Synthes/Globus Agreement. (Meyer Rep. ¶¶ 304–06.)  Mr. Meyer observed that the agreement is technically comparable to the asserted patents because the '678 patent that was licensed under the DePuy-Alphatec Agreement is directed to a pedicle screw, but it is of limited application, and the patents-in-suit represent a greater technological improvement.   (Id. ¶¶ 314–15.)   Mr. Meyer also found that the DePuy-Alphatec Agreement was generally economically comparable with some distinguishing factors that would exert either upward or downward pressure on the 10% royalty reached in that agreement.  (Id. ¶¶ 316—29.) Ultimately, Mr. Meyer concluded that the 10% royalty in the DePuy/Alphatec Agreement provides a relevant valuation indicator for the determination of a reasonable royalty as it "represents a market value

license transaction for a single patent in the spinal implant industry that is technically comparable to, but significant less technically valuable than, the Asserted Patents . . ."  (Id. ¶ 330.)  He also observed that the DePuy/Alphatec Agreement is not as relevant as the Synthes/Globus License addressed in Georgia-Pacific factor two due to the facts that: (1) the ICI Case patents are more valuable than the '678 patent; (2) Globus is the licensee in both hypothetical licenses; and (3) the timing of the agreements relative to the hypothetical negotiation date.  (Id. ¶ 330.)

Accordingly, to the extent Mr. Meyer relied on the DePuy-Alphatec Settlement pursuant to factor twelve of the Georgia-Pacific factors, I decline to exclude it.

**IV.  CONCLUSION**.

For all of the foregoing reasons, I will deny Globus's Motion to Exclude the Opinion of Paul Meyer.  An appropriate Order follows.