**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                              :
**MOSKOWITZ FAMILY LLC**                    :
                                                              :         **CIVIL ACTION**
                              *Plaintiff,*                :
                                                              :
v.                                                            :         **No. 20-3271**
                                                              :
**GLOBUS MEDICAL, INC.**                       :
                                                              :
                              *Defendants.*            :
_____   :

<u>**MEMORANDUM OPINION**</u>

**Goldberg, J.**                                                                      **August 13, 2024**

This case involves patent infringement and invalidity claims centered around spinal implants. Plaintiff Moskowitz Family LLC holds several patents spinal implant-related patents designed to avoid the adverse outcomes that sometimes occur with spinal fusion surgery. Plaintiff's inventions include minimal impaction, steerable, and custom-fit intervertebral implants that minimize musculoskeletal disruption and nerve root retraction during and after the procedure. Defendant Globus Medical, Inc. is a spinal fusion company that sells intervertebral spinal implants.

On November 20, 2019, Plaintiff sued Defendant alleging both direct and indirect infringement of these various patents. Defendant counterclaimed on invalidity grounds. Following a trial held from December 4, 2023 to December 13, 2023, a jury returned a verdict finding that Plaintiff had not met its burden of proving, by a preponderance of the evidence, infringement by certain of Defendant's accused products of specified claims on three of the patents-in-suit (the '269 patent, the '319 patent, and the '740 patent). The jury also found that Defendant had not met its burden of proving, by a preponderance of the evidence, that the specified claims of three of the patents-in-suit were invalid.

Currently before me is Plaintiff's Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a) and/or for a New Trial Under Federal Rule of Civil Procedure 59.  For the following reasons, I will deny the Motion in its entirety.

## I.     MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Standard of Review

To prevail on a renewed motion for judgment as a matter of law following a jury trial and verdict, the moving party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings."  Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998) (internal quotations omitted).  "Substantial evidence" is defined as "such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review."  Perkin–Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984).

The court should only grant the motion "if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability" or no liability.  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993) (citing Wittekamp v. Gulf Western Inc., 991 F.2d 1137, 1141 (3d Cir. 1993)).  "In determining whether the evidence is sufficient to sustain [the verdict], the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  Lightning Lube, 4 F.3d at 1166 (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190 (3d Cir. 1992)).  Rather, the court must resolve all conflicts of evidence in favor of the non-movant.  Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1348 (3d Cir. 1991); Perkin–Elmer Corp., 732 F.2d at 893.  "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, granted only, if viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably [have reached its verdict]."  Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).

Where the movant bears the burden of proof, the court must "appl[y] a stricter standard." AVM Techs., LLC v. Intel Corp., 334 F. Supp. 3d 623, 626 (D. Del. 2018) (citing Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1177 (3d Cir. 1976)). To grant judgment as a matter of law in favor of a party that bears the burden of proof on an issue, the Court "must be able to say not only that there is sufficient evidence to support the [movant's proposed] finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding." Id.; see also Mentor H/S, Inc. v. Medical Device Alliance, Inc., 244 F.3d 1365, 1375 (Fed. Cir. 2001) ("Courts grant JMOL for the party bearing the burden of proof only in extreme cases, when the party bearing the burden of proof has established its case by evidence that the jury would not be at liberty to disbelieve and the only reasonable conclusion is in its favor."). "A district court may overturn a jury's verdict only if upon the record before the jury, reasonable jurors could not have reached that verdict." LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001).

**B. Whether Globus Directly Infringes the '319 Patent as a Matter of Law**

Among the patents-in-suit is the '319 patent, which is comprised of: (1) an expandable intervertebral spinal implant, and (2) a tool assembly for inserting the implant into the spine and then expanding the implant by rotating a screw within it. The claim language (with emphasis on the disputed limitation) states:

1. A system comprising:

    a tool assembly which comprises:

    > a first tool having a first proximal end and first distal end with a first handle and ***a gripper, the gripper being positioned at the first distal end, cooperating with the first handle***, and having first and second engagement prongs positioned at the first distal end, wherein the first tool defines an adjusting tool passage through the first tool; and

    > a second adjusting tool having a second proximal end and second distal end with a second handle positioned at the second proximal end, a screw engagement portion positioned at the second distal end, and a shaft extending from the second handle to the screw engagement portion, wherein the shaft of the second adjusting tool is sized with a smaller

3

diameter than that of the adjusting tool passage such that the second adjusting tool can extend through the adjusting tool passage of the first tool; and

an expandable spinal implant sized and configured to be implanted in a human spine, the expandable spinal implant comprising a first expandable spinal implant structure, a second expandable spinal implant structure, and an adjusting screw having a new screw head and a threaded portion, wherein the expandable spinal implant is configured to expand the first expandable spinal implant structure in response to turning of the adjusting screw, wherein the expandable spinal implant defines first and second tool engagement indentations sized and configured for receiving the first and second engagement prongs of the first tool, wherein the adjusting screw is positioned within the expandable spinal implant in a screw location such that he second adjusting tool can extend through the adjusting tool passage of the first tool to engage the screw head of the adjusting screw while the first and second engagement prongs of the first tool are engaged with the first and second tool engagement indentations of the expandable spinal implant.

('319 patent, cl. 1 (emphasis added).)

The jury found no infringement of this patent by any of Defendant's accused products.  At trial, Defendant only disputed infringement as to a single limitation—whether the accused products' inserter tool had an implant gripper "cooperating" with the handle of the inserter tool.  According to Defendant, the claim language "cooperating" required that the handle actuate the gripper at the first distal end so that it grasps or grip the implant using its prongs.  As the accused products' handles did not have any role in actuating the gripping functionality of the mechanism that attaches to the implant, Defendant contended that the accused products did not satisfy the "cooperating" limitation.

Plaintiff now contends that it presented voluminous evidence that Defendant's RISE, CALIBER, and MAGNIFY-S products satisfy each of the limitations of the '319 patent.  With respect to the "cooperating" limitation, Plaintiff argues that the ordinary meaning of the term "cooperating" requires only that two components work together.  Because Defendant's Director of Product Development admitted that the gripper and handle of the accused inserter tool work together, it asserts that the limitation is satisfied.

The crux of the Plaintiff's Motion turns on the unresolved meaning of the term "cooperating" as used in the '319 patent.  It is well established that, absent a specific definition, "[c]laim terms are generally given their plain and ordinary meaning, which is the meaning one of ordinary skill in the art would ascribe to a term when read in the context of the claim, specification, and prosecution history." Kyocera Senco Indust. Tools Inc. v. Int'l Trade Comm'n, 22 F.4th 1369, 1378 (Fed. Cir. 2022). "[P]arties cannot reserve issues of claim construction for the stage of post-trial motions." Hewlett-Packard Co. v. Mustek Systems, Inc., 340 F.3d 1314, 1320 (Fed. Cir. 2003).  "When issues of claim construction have not been properly raised in connection with the jury instructions, it is improper for the district court to adopt a new or more detailed claim construction in connection with the JMOL [judgment as a matter of law] motion." Id.  Rather, the issue is "limited to the question of whether substantial evidence supported the verdict under the agreed instruction." Id.  "In other words, where the parties and the district court elect to provide the jury only with the claim language itself, and do not provide an interpretation of the language in light of the specification and the prosecution history, it is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the language and test the jury verdict by that new and more detailed interpretation." Id. at 1320–21; see also Packet Intelligence LLC v. NetScout Syst., Inc., 965 F.3d 1299, 1312 (Fed. Cir. 2020) (holding that where parties and court elect to provide the jury with only the claim language itself, analysis on JMOL "is confined to whether substantial evidence supports the jury's verdict under the undisputed claim construction at trial").

The Federal Circuit has refused to remand a case for further construction of a claim term when the purported dispute over claim construction was raised for the first time after the jury verdict. Verizon Servs. Corp. v. Cox Fibernet Virginia, Inc., 602 F.3d 1325, 1333–34 (Fed. Cir. 2010); see also Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp., 790 F.3d 1329, 1341 (Fed. Cir. 2015) (holding that a party waived its right to seek a new claim construction because it did not seek that construction until after trial).  When there is conflicting evidence as to the plain and ordinary meaning of a term, a jury is entitled to credit certain evidence, and that determination should not be disturbed on a JMOL motion.

See <u>Finesse Wireless LLC v. AT&T Mobility LLC</u>, 689 F. Supp. 3d 332, 352 (E.D. Tex. 2023).  "[T]he verdict must be tested by the charge actually given and by giving the ordinary meaning of the language of the jury instruction."  <u>Hewlett-Packard</u>, 340 F.3d at 1321.

Here, during claim construction proceedings in July 2021, neither party indicated that the term "cooperating" required construction beyond its plain and ordinary meaning.  The parties then proceeded through expert discovery, at which time Defendant's expert Michael Sherman—in a report submitted on April 4, 2022—opined that any alleged gripper of an accused Globus product "does not cooperate with the first handle" because "*the plain meaning of the term given the context is that there must [be] some actuation of the gripper by or using the handle*."  (Sherman Report ¶ 119 (emphasis added).)  As such, Plaintiff was on notice of Defendant's position that the plain and ordinary meaning of the word "cooperate" as used in the '319 patent to one of ordinary skill in the art was that it meant to "actuate."

Just prior to trial, the parties brought to light an additional claim construction dispute regarding the term "connecting support structure."  In an effort to avoid additional construction issues being raised at trial, I directed the parties to brief any remaining terms requiring claim construction.  (<u>See</u> Nov. 21, 2023 Order, ECF No. 319.)  Neither party raised the term "cooperating."

Thereafter, at trial, Plaintiff's expert, Dr. William Rosenberg provided limited testimony regarding whether Defendant's RISE, CALIBER, and MAGNIFY-S products satisfied the "cooperating" claim limitation.  Dr. Rosenberg testified that the RISE inserter tool "has a handle at one end and a gripper at the other that cooperate together."  (N.T. 12/6/23 at 29:1–3.)  This configuration was shown in Exhibit PTX-416.41.  Dr. Rosenberg went on to explain that the "cooperating" claim limitation was present in both the CALIBER and MAGNIFY-S products.  (<u>Id.</u> at 28:25–30:13.)  Dr. Rosenberg's entire testimony on this subject was:

> Q.     What does this claim limitation ["cooperating" in the '319 patent] require?
> A.     So this is talking about the first tool.  And that has a handle at one end and a gripper at the other that cooperate together.  And it has

> engagement prongs at the end, as well as a passageway for that expansion
> tool.
> Q.      Does the RISE product have an inserter tool at the gripper.
> A.      It does.  We can see here from the technique guide—on the left
> is a photograph, PTX—which is a photograph, PTX-416, page 41.  ON
> the right is an illustration form the technique guide, PTX-58, page 9.
> And there—there's the first tool with its handle and gripper.

(Id. 28:25–29:11.)  Dr. Rosenberg played a video, created by Defendant, to show the placement of the

RISE and its expansion.  (Id. at 39:14–25.)  He opined that the video showed "the tool coming in and

mating with [the implant], with the prongs."  (Id. at 40:2–3.)  Dr. Rosenberg did not provide any

testimony showing "cooperation" in connection with that video. (Id. at 39:14–46:19.)  Moreover, Dr.

Rosenberg was never asked to explain what the claim term "cooperating" meant, never suggested that it

meant only that the handle and gripper "act or work with" one another, and never explained how he

applied it to the facts of the case.[1]  The jury was at liberty to find his testimony not credible.

Subsequently, Defendant's expert, Michael Sherman, provided the following testimony

regarding the plain and ordinary meaning of the "cooperation" limitation in the '319 patent:

> Q.      What is it—what—what does cooperation between the gripper
> and the handle involve?
> A.      I think it involves an actuation.  Right?  It's—it's—it's a co-
> operation.  You need to do something—so—well, you need to do
> something to the handle—for it—and it does something to the gripper.
> They operate together.  They co-operate.  There needs to be some action
> and reaction,

---

[1]      Plaintiff contends that Defendant did not ask Dr. Rosenberg about the "cooperating" term on cross-
examination, and, thus, he was unable to respond to Defendant's arguments.  As Defendant correctly notes,
however, Plaintiff had the burden to show infringement during direct, knew what Defendant's position was,
and failed to elicit the proper testimony during direct.  Defendant had no obligation to raise the issue on cross-
examination.
        Plaintiff also argues that, after Defendant's expert testified, it requested that Dr. Rosenberg be
permitted to provide rebuttal testimony, but I initially declined to allow it.  When I asked Plaintiff's counsel
to explain what exactly Mr. Rosenberg would clarify, counsel identified four specific areas where rebuttal
was required: (a) testimony about the second implant structure of the '268 patent; (b) testimony about
serrations on the bone anchor; (c) testimony about a single continuous arc; and (d) "that the tools operate
exactly how he believes they operate, but there's infringement nonetheless."  (N.T. 12/12/23, 166:3–170:22.)
I allowed rebuttal testimony on only the first two subject areas.  (Id.)  Plaintiff now contends that Dr.
Rosenberg's rebuttal testimony regarding the "cooperation" limitation would have been included in the fourth
subject area.  But Plaintiff did not make that argument, let alone explain how it could not have anticipated
Mr. Sherman's definition of "cooperation" based on his expert report.  Moreover, even had Dr. Rosenberg
given an alternative definition, the jury would have remained free to credit Mr. Sherman's definition.

> Q.    Does the handle in the accused products cause any gripping functionality in the accused products?
> A.    No, it doesn't.

(N.T. 12/11/23 at 181:3–12.)  Defense counsel then walked Mr. Sherman through each of the accused products in detail to demonstrate that none of the handles of those products performed any "cooperation" with the gripper.  (Id. at 181:13–194:4.)

On cross-examination, Plaintiff's counsel pressed Mr. Sherman on the meaning of "cooperating"

> Q.    So just to make sure we're all clear, you'd agree that the ordinary meaning of cooperate is to act or work with another.  Act together; right?
> A.    I think I said — well, it's to cooperate.  To operate together; yeah.  If that's what you just said, I think—
> Q.    To act together; fair?
> A.    Sure.
> Q.    Okay.  But your opinion is that, for the gripper to cooperate with the handle, there must be some actuation of the gripper by the handle; right?
> A.    Yes, because it's—it's got to cooperate on the gripping function. So that's how I read the claim.  It's got to actuate.  There has to be an action, reaction.  There has to be something that the handle does so that the gripper grips.
> Q.    The claim does not use the word actuate; right?
> A.    No; it doesn't use that.
> Q.    And when you say actuate, you meant the handle has to actually perform an action on the gripper.  Is that what I just heard you say, sir?
> A.    Yes, I think that's right.
> Q.    But the claim doesn't say perform action either; right?
> A.    The claim says cooperate.  Cooperating, actually.
> Q.    Okay.  And it doesn't say perform action; right?
> A.    It doesn't say the words perform action; that's correct.
> Q.    Okay.  And the ordinary meaning of actuate is to put into mechanical action or motion?
> A.    That's a—I think that's a reasonable meaning.
> Q.    And that's obviously a different word that cooperate; right?
> A.    It is.
> Q.    With a different meaning?
> A.    I don't—I don't think it's a terribly different meaning.  I'm not sure it is, in a context of this claim.

(N.T. 12/11/23 at 228:6–229:13.)  Mr. Sherman further stated that his definition of the word "cooperate"—as used in the patent—was based on "a plain and ordinary meaning as would have been known to a person of ordinary skill in the art.  So a person like me, an engineer developing an implant

at the time of the invention."[2]  (Id. at 227:25–228:5.); see also Eon Corp. IP Holdings v. SilverSpring Networks, 815 F.3d 1314, 1320 (Fed. Cir. 2016) ("The ordinary meaning of a claim term is not the meaning of the term in the abstract.  Instead, the ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent. . . . The claims . . . do not have meaning removed from the context from which they arose." (internal quotation marks omitted)).

At no point did Plaintiff advance an argument that the "cooperating" claim limitation meant any of the things Plaintiff now says it means: acting together with, moving with, directing, or guiding. Plaintiff points to no other testimony regarding the plain and ordinary meaning of the term "cooperating" to a person of ordinary skill in the art and concedes that Dr. Rosenberg did not otherwise explain the plain meaning of "cooperating."  (Pl.'s Reply Br. 4.)

Plaintiff also raised no issue regarding the proper construction of the term "cooperating" during jury instructions but rather agreed to the jury instructions that provided: "when you look at the claim for words . . . which have not provided a definition, you should apply the ordinary meaning of those terms, as understood by [a] person of ordinary skill in the field of the technology at issue of the patents in suit at the time of their invention."  (N.T. 12/13/23 at 19:1–5.)  This instruction, framed without a clarifying construction, placed on Plaintiff the "difficult task of showing, based simply on the words, that the only reasonable view" is that "cooperating" meant acting together with, guiding, or directing, and it failed to meet that burden.  Avid Tech., Inc. v. Harmonic, Inc., 812 F.3d 1040, 1049 (Fed. Cir. 2016); see also

---

[2]      Plaintiff contends that, when analyzing the issue of invalidity and comparing the patents-in-suit to the prior art, Mr. Sherman took the opposite position that the "cooperating" limitation did not require actuation.   (N.T. 12/12/23 at 118:4–127:13.)   Plaintiff contends that, "[i]t is axiomatic that claims are construed the same way for both invalidity and infringement."  Amgen Inc. v. Hoechst Marion Roussel, 314 F.3d 1313, 1330 (Fed. Cir. 2003).
        The Federal Circuit, however, has recognized that because the features of the accused product are often undisputed, this axiom results in a common approach by accused infringers:  the principal argument challenges a broad claim construction while a contingent argument challenges validity of the asserted patents under 35 U.S.C. § 112 in light of that broad construction.  Id.  Thus, the fact that Mr. Sherman took opposing positions was a legitimate litigation strategy.  Here, the jury's rejection of Defendant's invalidity argument was consistent with its finding that the plain meaning of the term "cooperating" required actuation and was the same as for infringement.

Enovsys LLC v. Nextel Commc'ns, Inc., 614 F.3d 1333, 1344 (Fed. Cir. 2010) (denying JMOL where "at no time before or during trial did [defendant] object to the district court's claim construction, request clarification, or offer the construction it now advances on appeal."). The jury thus properly credited Mr. Sherman's explanation of the plain and ordinary meaning of the term "cooperating" as being "actuating." See ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 520 (Fed. Cir. 2012) ("In the absence of such a construction, however, the jury was free to rely on the plain and ordinary meaning of the term . . ."); Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P., 850 F.3d 1302, 1312 (Fed. Cir. 2017) (finding that jury reasonably relied upon expert testimony regarding the plain and ordinary meaning of the term); (see also N.T. 12/5/23 at 139:1–6 (Plaintiff's counsel conceding that what a claim term should mean to a person of ordinary skill in the art is "classic expert testimony").).

With the term "cooperating" given its plain and ordinary meaning to a person of ordinary skill in the art, there was sufficient evidence from which a jury reasonably could find noninfringement.  First, Dr. Rosenberg provided scant testimony on the "cooperating" limitation, never explaining to the jury how the handle and the gripper in the accused products perform any kind of infringing "cooperating" or even how the handles worked with the gripper.  Although Dr. Rosenberg relied on Globus technique guides to explain how implants and tools operate, Plaintiff did not identify where those technique guides say anything about the handle "cooperating" with the gripper.

Second, Mr. Sherman opined, in detail, how the accused products failed to meet the "cooperating" limitation, using a definition of "cooperating" that required some actuating or operation between the handle and the gripper.  Although he agreed that the "ordinary meaning" of "cooperate" was to act or work with another, he clarified that, in the context of the patent and to one of ordinary skill in the art, the term "cooperate" meant "actuate."  (N.T. 12/11/23 at 228:6–229:13.)

Third, Defendant called its Director of Product Development, Christy Mace, to describe the functioning of the accused products.  Ms. Mace testified as follows:

> Q.      What role does the handle which you've now removed play in operating the mechanism that grips the CALIBER implant onto the tool?
> A.      None at all.
> Q.      No role?
> A.      No role.

(N.T. 12/11/23 at 63:22–64:2.)  She testified similarly with respect to the other accused products.  (Id. at 64:3–69:10.)  On cross-examination, Ms. Mace testified that the gripper and the handle of the accused products "move together" to guide the expandable implant into a patient's disc space:

> Q.      But you agree, once the implant is—is at the end of the tool, the handle is used to guide the tool to the surgical site; right?
> A.      Are you asking me if the handle is attached to the inserter; does it all move together?
> Q.      That's what I'm asking.
> A.      Yes; it does.
> Q.      All right.  And so the surgeon uses the—the handle in part to guide the—the implant to the intervertebral space where it can be expanded?
> A.      Yes; as it's attached they would.
> Q.      All right.  And where he guides the handle at the proximal end, the implant at the distal end will go?
> A.      Sure.

(N.T. 12/11/23 at 89:23–90:11.)  But Plaintiff does not point to any evidence from any expert that using the handle to "guide" or "direct" a tool is equivalent to the handle "cooperating" with the gripper.  Accordingly, this testimony fails to substantiate Plaintiff's argument.

In short, there was ample evidence that the handles of the accused products did not "cooperate" with the grippers of those products.  While Dr. Rosenberg testified differently, the jury was free to assign less weight to his opinion.  Ultimately, Plaintiff has not met its burden of showing that, viewing the evidence in the light most favorable to Defendant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find noninfringement.

**C.  Whether Globus Directly Infringes the '740 Patent as a Matter of Law**

Plaintiff also claimed that Defendant's accused products infringed the '740 patent, which relates to an anchor—referred to as a "curvilinear nail-screw"—designed to be implanted in the vertebrae of

the spine while avoiding penetrating the pedicle bones in the vertebral body.  Plaintiff's asserted claim one of the '740 patent states (with highlights to show disputed limitations):

> A spinal fusion implant comprising:
>
> a first curvilinear nail-screw for penetration and implantation into a first vertebral body along a first curved trajectory that avoids penetrating pedicles, wherein the first curvilinear nail screw extends from a first proximal end to a first distal end along the first curved trajectory with a first head at the first proximal end and a first bone penetrating pointed tip at the first distal end, wherein the first curvilinear nail-screw comprises first ***means for engaging a first cancellous core*** of the first vertebral body positioned along a first distal portion of the first curvilinear nail-screw proximate the first distal end, wherein the first curved trajectory is along a ***first single continuous arc***;
>
> a second curvilinear nail-screw for penetration and implantation into a second vertebral body along a second curved trajectory that avoids penetrating pedicles, wherein the second curvilinear nail screw from a second proximal end to a second distal end along the second curved trajectory with a second head at the second proximal end and a second bone penetrating pointed tip at the second distal end, wherein the second curvilinear nail-screw comprises second ***means for engaging a second cancellous core*** of the second vertebral body positioned along a second distal portion of the second curvilinear nail-screw proximate the second distal end, wherein the second curved trajectory is along a ***second single continuous arc***; and
>
> a connecting support structure defining a first hole sized and configured for receiving the first curvilinear nail screw and a second hole sized and configured for receiving the second curvilinear nail screw such that the first curvilinear nail-screw is held with respect to the second curvilinear nail-screw with the first curvilinear nail-screw extending into the first vertebral body without penetrating pedicles and the second curvilinear nail-screw extending into the second vertebral body without penetrating pedicles.

('740 patent, JTX-3 at cl. 1.)

Figure 1 A of the patent specification illustrates this curvilinear nail screw as follows:



Figure 1 D presents a different view:



At trial, Plaintiff sought to prove that Defendant's COALITION MIS, INDEPENDENCE MIS HEDRON, and CORBEL products—which are also spinal implant devices—infringe the '740 patent. Defendant's noninfringement argument was that: (a) the accused products do not have a "single continuous arc," and (b) the accused products do not have a "means for engaging a cancellous core." Plaintiff now contends that, based on the evidence presented at trial, no reasonable jury could have concluded that the bone anchors of the accused products do not meet these claim elements.

1. <u>"Single Continuous Arc"</u>

The first limitation at issue involves the '740 patent's requirement that there be a first and second "curvilinear nail-screw" for penetration and implantation wherein the "curved trajectory is along a . . . single continuous arc." Plaintiff argues that the relevant curved trajectory is the trajectory along which the curvilinear nail-screw is actually implanted into the vertebral body (the bone). According to Plaintiff, only the implanted portion must be curved in a "continuous arc," while the remainder of the screw, including the head, need not be. Plaintiff contends that both parties' experts agreed, and Defendant's own documents show, that the portion of the accused bone anchors that penetrates and is implanted into the bone is continuously curved. (<u>See</u> N.T. 12/6/23 at 91:1–15, 190:1–190:9 (Dr. Rosenberg opining that even though the continuous arc does not extend through the entirety of the head, that is irrelevant to infringement because the head does not penetrate into the bone); N.T. 12/11/23 at 250:20–251:24 (Mr.

Sherman opining that the curvature of the accused anchors runs from the midpoint of the head to the end, and that the anchor head stays in the implant and does not penetrate the bone); PDX-3.144; PTX-38; PDX-3.245 (Defendant's documents showing that the accused products have a single continuous arc beginning midway through the anchor head).)

Defendant does not dispute Plaintiff's description of the accused bone anchors, *i.e.*, that the portion that penetrates and is implanted into the bone is continuously curved.  Rather, it argues that the claim language of the '740 patent requires that the entire length of the curvilinear nail screw extend along a "single continuous arc" from end to end, including the head and the tip.  Defendant posits that this construction is supported not only by the plain language of the claim but also with the position that Plaintiff took during prosecution of the '740 patent.  Defendant urges that, because the head of the accused products is not curved along the single continuous arc, the accused products do not infringe.

Plaintiff's motion again constitutes a belated "claim construction argument regarding the meaning of the term ['single continuous arc'] . . . in the guise of a challenge to the sufficiency of the evidence of [non-]infringement."  ePlus, Inc., 700 F.3d at 520.  "On JMOL, the issue here should [be] limited to the question of whether substantial evidence supported the verdict under the agreed instruction."  Hewlett-Packard, 340 F.3d at 1320.  "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial."  Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1359 (Fed. Cir. 2006) (internal citations omitted).

Plaintiff never pressed its version of this claim language during claim construction proceedings, during the supplemental briefing period for claim construction issues prior to trial, or during the jury charge conference.[3]  Indeed, both parties agreed that the jury should be instructed that the term should be given its plain and ordinary meaning.  ePlus, Inc., 700 F.3d at 520 (holding that absent a more detailed interpretation of the claim language presented prior to trial, "[t]he jury was free to rely on the plain and

---

[3]       During claim construction, the parties disputed the meaning of the term "curvilinear nail screw" but only as to whether the nail screw must have threads, or whether it could have fishhooks, ridges, or equivalent structures.  Neither party raised the issue of what "single continuous arc" meant.

ordinary meaning of the term . . . ."). As explained above, a jury can rely on expert testimony as to the plain and ordinary meaning of the term. Id.; see also TRUSTID, Inc. v. Next Caller, Inc., No. 18-cv-172, 2022 WL 318299, at *4–5 (D. Del. Jan. 5, 2022). Plaintiff—as the unsuccessful party—has the burden to show that it has the only reasonable view of the claim limitation, and that the jury's verdict was not supported by substantial evidence. Comcast IP Holdings I, 850 F.3d at 1312.

Thus, the inquiry here is whether there was substantial evidence on which the jury could find that the language of the '740 patent meant that the "single continuous arc" included the head (Defendant's position), or whether the plain and ordinary meaning of the term was that the head is separate from the portion that defines the "single continuous arc" because the head is not implanted into the vertebral body (Plaintiff's position). Viewing the trial evidence in the light most favorable to Defendant, I conclude that Plaintiff has not proven entitlement to the "sparingly invoked remedy" of judgment as a matter of law.

As a primary matter, the jury's interpretation finds support in the plain language of the claim. The claim refers to a "first curvilinear nail-screw" that "extends from a first proximal end to a first distal end along the first curved trajectory," thus suggesting that "first curved trajectory" goes from end to end. The claim further defines the curvilinear nail screw as having a "first head" at the proximal end and a "first bone penetrating tip" at the distal end. It then states that the "first curved trajectory" must be along a "first single continuous arc." A reasonable plain reading of this language suggests that "continuous arc" describes the entirety of the nail screw, including the head and the bone penetrating tip. Nothing in the plain language of the claim suggests that only the portion of the nail screw that is implanted into the bone must be curved.

Moreover, both experts testified in manner such that the jury could find that the "single continuous arc" described in the claim language went from end to end of the nail screw, i.e., included the head. Dr. Rosenberg testified:

- "Q. And what is the curved structure that you just referred to called in the patent? A. It's a nail screw. So it has some features that are like a nail and some features that are like a screw, and there's a curve to it." (N.T. 12/6/23 at 80:12–16.)

- Q. Does the '740 patent teach a benefit of strength compared to straight screws? A. It does. In one of the—the benefits it teaches is the ability to have the same strength as a conventional screw with a curved trajectory. And the curved trajectory allows you to avoid certain structures, if you want to, by changing what is obligated for a screw to be a straight trajectory, we can now curve that. (Id. at 81:22–82:4.)

- Q. Let's talk about insertion of the curvilinear nail screw. How does the '740 patent describe insertion? A. Well, it talks about using—there's a pointy tip to it so it can penetrate the bone. And since it's curved, it can—it can go in any one of a number of different directions. You can decide what direction for it to go. And—and it *includes* a—a head that you can tamp. (Id. at 82:7–14 (emphasis added).)

- Q. Would you explain, Dr. Rosenberg, what the next element that we're going to discuss about the curvilinear nail screw element requires? A. So it requires that this curved trajectory be from the proximal end, which is the one closest to the surgeon, to the distal end, which is the one furthest away from the surgeon. And it has a head at the end closest to the surgeon, the proximal end." (Id. at 95:10–17.)

- Q. Let's drill down on the claim element that requires a curved trajectory being a single continuous arc. What—what do you understand that claim limitation to require, Dr. Rosenberg? A. Well, as a single continuous arc, meaning that it's *curved at all spots, it doesn't come to a point or a straight spot or anything like that* . . . (Id. at 96:9–15 (emphasis added).)

- Q. And a single continuous arc is another way of saying a continuous curve. Right? A. Yes. Q. Can't have any kind of corner or vertex or angle, sharp edge. Right? It's got to be a continuous curve. Right? A. Correct. (Id. at 183:5–10.)

- [Describing the accused product] Q. You are excluding the head from your determination of the single continuous arc. Right? A. *No, I think it starts at the head. Q. Well, it starts at the head but it doesn't include the head? It includes a portion of the head. Is . . . that fair? A. That's fair. . . . Q. Okay. If you extended your curve—excuse me. If you included the remainder of the head, that would no longer be a single continuous arc. Correct? A. Yes.* (Id. at 184:15–186:10 (emphasis added).)

- Q. [B]ecause if you included my straight line [on the accused products], which goes to the end of the anchor, there's no infringement. Correct. A. There would be—well, there's no curve. Correct. (Id. at 187:6–8.)

16

- Q.  But you're not including the rest of the head in—on the other end of the line. Right?  A.  The head doesn't penetrate.  (Id. at 190:7–9.)

Mr. Sherman then testified:

- Q.  Why don't the Globus accused products have a single continuous arc?  A. . . . So you need to have a curved—single continuous arc from a first proximal end to a first distal end, from end to end.  And I don't believe the Globus anchors have that.  I—my analysis shows me that there's a linear section on the Globus anchors.  Q.  So let me ask you this, ***using the plain language***, do the Globus anchors have a single continuous arc from the proximal end to the distal end?  A.  No, I don't believe they do.  (N.T. 12/11/23 at 144:11–145:5 (emphasis added).)

- Q.  You were in the courtroom when Dr. Rosenberg started his curve, right, at that crosshair in the middle of the anchor?  Do you recall that?  A. . . . Yes, I recall that.  Q.  There's—there's a curve starting at that crosshair going all the way to the pointy end.  Does that satisfy this claim limitation?  A.  No, I don't believe so.  Q.  Why not?  ***A.  Well, again, I think the claim says from the first proximal end to the first distal end. It doesn't say near the first proximal. It says from the end to end.***  (N.T. 12/11/23, 148:3–15 (emphasis added).)

- Q.      Do you agree with Dr. Rosenberg's interpretation of this graphic [of the accused product].  A.  Well, I think he's showing the curve terminating under the head.  And I agree that the curve terminates, you know, short of the distal—proximal end, but I don't believe this anchor meets the claim construction or the claim limitation, which says—and I've highlighted or underlined it anyway, the first proximal end to a first distal end, a single continuous arc. . . . Q.  Is the absence of a single continuous arc from the accused anchors enough for the jury to find noninfringement?  A.  It is. . . ."  (Id. at 149:5–20.)

Thus, there was ample evidence from which a jury could find that the accused product did not infringe.

Further, the jury considered evidence and testimony regarding the '740 patent's prosecution history.  According to the patent prosecution documents for the '740 patent, the patent examiner told Plaintiff that one of the prior art references, Matityahu, disclosed a spinal implant with a curvilinear nail screw, that looked as follows:



(JTX0911.0117–18.)   Plaintiff's validity expert agreed that "the curved trajectory that the patent examiner identified went all the way from the head at the proximal end though the tip."  (N.T. 12/12/23 at 313:4–14.)   To overcome this prior art, Plaintiff explained that its nail-screw was different from Matityahu as the "nail-screw was 'continuously' curved from proximal to distal end while the screw of Matityahu had a straight portion."  (JTX0911.0168.)   Thereafter, in an effort to overcome a different prior art reference—Lieberman—Plaintiff stated that the curved trajectory of its invention extends from the first proximal "which contains the head," while in Lieberman, "the trajectory ends at the head."  (Id.)

At trial, Plaintiff did not address this prosecution history and the inferences to be drawn from therefrom.  Plaintiff's counsel now contends that the prosecution history does not impose Defendant's "end to end" requirement where the head of the nail-screw must be fully curved.  But such attorney argument does not factor into whether the evidence at trial was sufficient to sustain the verdict. Ultimately, the jury had substantial evidence on which to base its finding that the plain and ordinary meaning of "single continuous arc" described in the '740 patent required that the nail screw be curved end to end, all the way through the head.  Upon reaching that conclusion, the jury reasonably found that accused products did not have such a single continuous arc and, thus, did not infringe.

2.   "Means for Engaging a Cancellous Core"

The second limitation in dispute for the '740 patent is the requirement that the product has a "means for engaging a cancellous core."  I construed this claim as a means-plus-function limitation "with

a function of 'engaging a first/second cancellous core of the first/second vertebral body,' and a structure of 'a series of fish-hooks, threads, ridges, or equivalent structures known to a POSITA, extending along a linear direction of the curvilinear nail-screw.'" (D.I. 144 ¶ 7.)  Plaintiff now contends that the evidence was insufficient for jury to find that the accused products did not meet this limitation.

In support of its position, Plaintiff cites to the following evidence:

- Dr. Rosenberg identified two structures in the accused products that engage the bone. First, Dr. Rosenberg explained that the accused products have T-shaped ridges.  Second, he remarked that the accused products have serrations at the distal tip.  He explained that both of these structures are used to "engage the cancellous core," *i.e.,* grab onto the bone, because they maximize surface area for resistance to expulsion.  (N.T. 12/6/23 at 100:22–104:24.)

- Dr. Rosenberg reviewed the CAD drawings for the accused products showing mechanical testing and noted that "there are diagrams or drawings of these anchors with the serrations and T—T-beam, which is used to grab on to the bone." (N.T. 12/6/23 at 103:17–104:19.)  Dr. Rosenberg testified that the Defendant produced mechanical testing document, referred to "robust anchor fixation" appears to by referring to the serrations and T-shaped beam, which are features that engage with the cancellous core. (Id. at 28:12–29:16; PTX 272.2.)

- Defendant's expert, Mr. Sherman, agreed that a structure that has biased or ratcheted faces that extend outwardly from the body of the curvilinear nail screw to engage the surrounding bone would meet the construction. (N.T. 12/11/23 at 246:2–7.)  He further conceded that Defendant stated, in its technique guide, that anchor design provides purchase, *i.e.* the ability of one component to grip another without slipping.  (N.T. 12/11/23 at 246:14–247:9.)  In addition, he agreed that "purchasing," "opposing withdrawal of the device," or "grabbing onto" would satisfy the "means for engaging" limitation.  (N.T. 12/11/23 at 152:10–20, 244:7–14.)

Defendant responds that the jury had a sufficient basis to warrant a noninfringement finding.

- Mr. Sherman testified that Defendant's anchors lack the required structure because they do not have fishhooks or threads, and do not have "ridges or equivalent structure." (N.T. 12/11/23 at 151:2–19.)

- Mr. Sherman then testified that the ridges or ribs on the accused anchors do provide any additional purchase (Id. 152:14–153:6.)  Moreover, the T-shaped elements do not provide any engaging functionality.  (Id. 155:23–157:24.)

- Dr. Rosenberg admitted that he did not perform any testing to confirm his opinion that the T-shaped elements and the serrations would provide additional purchase.  (N.T. 12/6/23 at 151:5–164:3.)

- Although Defendant's mechanical testing documents refer to "resistance to expulsion," the full text of the documents refers to a "[d]ove-tailed anchor design [that] maximizes surface area for resistance to expulsion." This document does not mention T-shaped elements or serrations. (PTX 272.7.)

- Mr. Sherman explained that the structure on the accused devices that prevented backout was the rotatable cut-out screw heads on the body of the *implant.* According to Mr. Sherman, nothing on the accused *anchors* prevented backout, *i.e.,* engaging a cancellous core. (N.T. 12/11/23 at 154:20–157:24.)

- Mr. Sherman stated that the T-shaped elements and serrations were used to stiffen and strengthen the anchors, not to provide any additional purchase in Defendant's anchors. (N.T. Id. at 152:1–153:6.)

- Dr. Rosenberg relied on an anchor drawing that had a note, "all flags & burrs to be removed, all edges to be left sharp," as evidence that serrations provide additional purchase in the bone. (N.T. 12/8/23, 34:4–22.) Mr. Sherman explained that a sharper edge is not designed to engage the bone, and there is nothing on it to "grab purchase"— no ridge and no feature to purchase the bone. (N.T. 12/11/23, 157:1–13.)

Whether "means for engaging a cancellous core" is satisfied by the T-shaped elements or serrations on the accused products thus becomes a pure factual issue. Dr. Rosenberg identified several features on the bone anchors—including T-shaped ridges with serrations—that engage the bone. By contrast, Mr. Sherman explained that the anchors did not have any ridges or equivalent structures that provide any engaging functionality or purchase, and the T-shaped elements and serrations were included for bending strength. The jury was free to reject Dr. Rosenberg's testimony based on any number of reasons: its general distrust of his qualifications, his failure to test the accused products, or perhaps what it perceived to be a mischaracterization of Defendant's documents. The jury also had ample testimony from Mr. Sherman to substantiate a finding that the accused products lacked a key claim limitation and that the documents on which Plaintiff relied referred to the mechanical strength of the implant and not its ability to engage with the bone. See generally Packet Intelligence LLC v. NetScot Sys., Inc., 965 F.3d 1299, 1311 (Fed. Cir. 2020) ("While NetScout asks us to accept its interpretation of the record, the jury was permitted to weigh Dr. Almeroth's testimony over that of Mr. Waldbusser.")

Ultimately, Plaintiff has not met the "high standard needed to disregard the jury's fact-finding function on this issue." Versata Software, Inc. v. SAP Am., Inc., 717 F.3d 1255, 1262 (Fed. Cir. 2013).

Even if I were to weigh the evidence differently, I could not substitute my credibility determinations in place of the jury's. Rather, I must view the evidence in the light most favorable to Defendant and give it the benefit of every reasonable inference. Doing so, I find that the jury had sufficient evidence on which it could have found no infringement.

For all of the foregoing reasons, I will deny Plaintiff's Motion for Judgment as a Matter of Law.

## II.    RULE 59 MOTION FOR NEW TRIAL

In an alternative to its Motion for Judgment as a Matter of Law, Plaintiff moves for a new trial. Motions for new trials are governed by Federal Rule of Civil Procedure 59(a), which provides in pertinent part: "[t]he court may, on motion, grant a new trial on some or all of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Third Circuit has instructed that a new trial should only be granted when "the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand." Leonard v. Stemtech Int'l Inc., 834 F.3d 376, 386 (3d Cir. 2016) (citing Springer v. Henry, 435 F.3d 268, 274 (3rd Cir. 2006)); see also Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 128 (3d Cir. 2003) ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.") (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1352–53 (3d Cir. 1991).) The decision on whether or not to grant a new trial is committed to the sound discretion of the district court. Wagner by Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1017 (3d Cir. 1995).

Plaintiff's Motion for a New Trial rests on several grounds. First, as to the '319 patent, Plaintiff argues that the clear weight of the evidence demonstrates that the "cooperating" limitation was met, *i.e.*, the inserter tool's gripper moves in response to the surgeon moving the handle to guide the implant into place. As set forth above, however, the jury had ample grounds to find that the plain and ordinary

meaning of the term "cooperating" to a person of ordinary skill in the art requires some type of actuation, which was not present in the accused products.

Second, as to the '740 patent, Plaintiff argues that the clear weight of the evidence shows that Defendant's accused '740 products infringe because (a) the bone anchors of the accused products proceed along a single continuous arc, and (b) the bone anchors engage a patient's cancellous core. Again, however, the jury had sufficient evidence to find that these limitations were not satisfied. As such, Plaintiff is hard pressed to argue that the great weight of the evidence cuts against the jury's verdict.

Finally, Plaintiff contends that "juror confusion regarding infringement very likely occurred in this case." (Pl.'s Mot. New Trial 24.) Specifically, Plaintiff notes that, during closing arguments, Defendant argued that the jury should analyze the claims of the priority applications for the asserted patents and note that they differed from the claims of the asserted patents. (N.T. 12/13/23 at 88:7–89:9 ("[T]his is the 2009 application. This is the sum total of the claims in 2009. This is the invention in 2009. Do those claims look anything like the claims of the '740? Doesn't say anything about a connecting support structure. Doesn't say anything about a single continuous arc. It is a different invention.").) During jury instructions, I told the jury that "[a] provisional application is a temporary placeholder for a more substantive nonprovisional application to follow" and that "[t]he provisional application serves the purpose of setting a priority date for the claimed invention provided it contains a written description of the invention, and of the manner and process of making and using it in such full, clear, concise, and exact terms as to enable any person skilled in the art to make and use the claimed invention." (N.T. 12/13/23 at 37:3–11.)

Thereafter, during deliberations, the jurors requested the asserted patents' priority applications and a timeline showing various dates, including the issue date of the priority applications and asserted patents. (N.T. 12/13/23 at 129:15–134:7.) Plaintiff now contends that, "[g]iven the dearth of evidence supporting the jury's noninfringement verdicts for the '319 and '740 patents, there is a strong possibility the jury improperly: i) concluded there is no infringement because the filing dates of the asserted patents

are after the release of the accused products; or ii) compared the accused products to the claims of the priority applications rather than to the asserted patents."[4]

Plaintiff's speculation that this was a "strong possibility" of jury confusion does not warrant a new trial. This is especially the case where the priority applications were mentioned throughout the trial, including references made by Plaintiff.

During opening statements, Plaintiff's counsel was the first to reference the timelines of the asserted patents and their priority applications:

> You're going to see time lines from us. I'm pretty sure you're going to see time lines from Globus' lawyers as well. There's one time line now that I want to show you that just harkens back to something that I said earlier. And that's the invention time line. ***From our perspective, it will be important***, and the evidence will show, that you have in mind, that while the actual direct patent applications that were filed that led to the 268 and the 319, and the 740 patents were filed in 2018 and 2019, the applications to which they claim priority, which have the same specification and the same figures, and the same disclosure, were filed at the patent office in 2007 and 2009. The 2007 application is the application to which the 268 and 319 claim priority. The 2009 priority date is the one to which the 740 patent claims priority. ***And the reason that's important*** is because those two applications had already been filed at the patent office before any of the accused products that I just showed you were ever launched in the marketplace.
>
> And so what I expect that you will hear in this case, from Globus is, well wait a minute. Dr. Moskowitz didn't file the patent applications until long after these products were on the market. That's not quite right. It's not quite right in the sense that the applications themselves were filed in 2018 and 2019, and we can't dispute that. But the disclosure, the inventive ideas, you will hear, they were included in those applications from 2007 and 2009.

(N.T. 12/4/23 at 61:19–62:19 (emphasis added).)

Defendant's opening responded to these arguments in kind:

---

[4]     Plaintiff also argues that, during the cross-examination of Plaintiff's validity expert Dr. Kenneth Gall, Defendant's counsel asked about the fact that the claims in the priority applications are different from the asserted claims. (N.T. 12/12/23 at 307:11–311:6.) Plaintiff contends that this "sowed confusion" for the jury, and Plaintiff was unable to establish the irrelevance of this fact because I precluded redirect examination of Mr. Gall.
   This testimony was not improper, and Defendant properly referenced it in its subsequent examination of Mr. Gall regarding whether these patents were invalid under the prior art.

So remember when I said before—spinal fusion implants have been around for many, many decades.  And you heard a lot about—from the plaintiff's lawyer that you're going to see similarities between what the Moskowitz patents claim and things in certain of Globus's accused products.

That there are similarities should come as no surprise because there are a lot of designs for different implants out there that pre-date the Moskowitz's patent claims.   They predate the boundaries that Moskowitz wrote to define its property.

Some of those product designs, by the way, are Globus's own product designs.  I mentioned the timeline before that I disagreed with.  Here's the timeline that shows what really matters.  Most of the Globus products in this case came out before Moskowitz applied for those patents.

Remember, when the claims were written, the language describing how you infringe and what you have to have in your product to infringe, Globus's products were out there.

(N.T. 12/4/23 at 81:22–82:14.)

Thereafter, during Mr. Sherman's invalidity testimony, he was asked, on cross-examination, about the fact that each of the asserted patents had a priority date that was much earlier than the 2018 and 2019 filing dates.  (N.T. 12/12/23 at 107:13–21.)  Mr. Sherman conceded that there was no dispute as to the priority dates for each of the asserted patents.  (Id. at 111:11–23, 176:25–177:2.)  When Mr. Sherman was questioned about differences between the priority applications and the applications for the patents-in-suit and Mr. Sherman indicated that he had not seen the prior applications, Plaintiff's counsel then suggested that it was going to put those priority applications before the witness and the jury but did not do so.  (Id. at 150:12–25.)

Given these repeated references to the priority applications and the filing timelines, the jury's subsequent request for these documents was neither surprising nor an indication that the jury misunderstood the law.  Indeed, Plaintiff concedes that the jury was properly instructed on the infringement analysis and priority dates, and there is a presumption that jurors follow the instructions given to them.  Robinson v. First State Community Action Agency, 920 F.3d 182, 191 (3d Cir. 2019). Plaintiff's speculation that the jury's request for the priority application demonstrates a misapplication

24

of the law fails to meet its burden of showing an "overwhelming probability" that the jury was unable to follow the instructions and a likelihood that the evidence wrongfully admitted was "devastating" to the other party.  Id.

 Accordingly, I will deny Plaintiff's Motion for a New Trial.  An appropriate Order follows.